## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DROP A PIANO PRODUCTIONS LLC,
ADAM REBACK, AND MONIQUE
THACKER,

*Plaintiffs*,

v.

SURAJ MARABOYINA

*Defendant*.

Defendant's motion to dismiss, Dkt. 5, is denied without prejudice. Defendant is directed to follow Individual Civil Rule 6.A in seeking leave to re-file the motion to dismiss no later than November 1, 2025. Plaintiffs are reminded under Rule 6.A to file any responsive letter within three business days from the submission of Defendant's pre-motion letter. The Clerk of Court is respectfully directed to close Docket Number 5.

It is further ordered that Defendant serve this Order on Plaintiffs within two business days and file an affidavit of service no later than November 1, 2025. Counsel for Plaintiffs shall file a notice of appearance by November 1, 2025.

SO ORDERED.
Date: October 27, 2025
New York, New York

JOHN P. CRONAN
United States District Judge

No. 25-CV-8631 (JPC)

## <u>DEFENDANT'S NOTICE OF MOTION TO DISMISS</u>

PLEASE TAKE NOTICE that, upon the pleadings and the annexed Memorandum of Law, and all prior pleadings and proceedings herein, Defendant Suraj Maraboyina moves this Court, before the Hon. John P. Cronan, United States District Judge, at the United States Courthouse for the Southern District of New York, 500 Pearl St, New York, New York, at a date and time to be determined by this Court, for an Order pursuant to Federal Rules of Civil Procedure 12(b)(6), dismissing all claims against Suraj Maraboyina in their entirety, and awarding such other relief as the Court may deem just and proper.

Dated: October 24, 2025

Respectfully submitted,

*/s/ Jamie Hoxie Solano*
**DYNAMIS LLP**
Jamie Hoxie Solano
Tyler Finn

1

11 Park Place, 4th Floor
New York, New York 10007
Tel: (973) 295-5495
jsolano@dynamisllp.com
tfinn@dynamisllp.com

*Attorneys for Defendant Suraj Maraboyina*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DROP A PIANO PRODUCTIONS LLC,
ADAM REBACK, AND MONIQUE
THACKER,

  *Plaintiffs*,

v.

SURAJ MARABOYINA

    *Defendant*.

No. 25-CV-8631 (JPC)

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

Jamie Hoxie Solano
Tyler Finn
**DYNAMIS LLP**
11 Park Place, 4th Floor
New York, New York 10007
Tel: (973) 295-5495
Email: jsolano@dynamisllp.com
Email: tfinn@dynamisllp.com


*Attorneys for Defendant Suraj Maraboyina*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION.................................................................................................1

FACTUAL ALLEGATIONS.................................................................................2

LEGAL STANDARD ...........................................................................................3

ARGUMENT .........................................................................................................5

   I.   THE COMPLAINT SHOULD BE DISMISSED AGAINST DROP A PIANO AND
REBACK IN FAVOR OF THE MANDATORY ARBITRATION CLAUSE IN THE
PARTIES' AGREEMENTS .............................................................................5

   II.  PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW FRAUD ...................8

     A.   Plaintiffs Make No Allegations of Scienter. ...........................................8

     B.   Plaintiffs' Barebones Allegations Run Afoul of Rule 12 and Rule 9(b)....................9

   III. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY ....11

   IV. PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 349 OF NEW YORK'S
GENERAL BUSINESS LAW ...........................................................................13

   V.  PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT ...................14

     A.   The Unjust Enrichment Claim Should Be Dismissed as Duplicative .....................15

     B.   Plaintiffs Do Not Allege That Defendant Retained Any Benefit From Their
Investment ...........................................................................16

CONCLUSION ...................................................................................16

## **TABLE OF AUTHORITIES**

**CASES**

*123RF LLC v. HSBC Bank USA, N.A.*, 663 F. Supp. 3d 391 (S.D.N.Y. 2023) ............................ 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). .................................................................................. 3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). .................................................................. 3

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224 (S.D.N.Y. 2014) .... 12

*Birmingham Assocs., Ltd. v, Abbott Labs.*, 547 F.Supp.2d 295 (S.D.N.Y. 2008) ......................... 6

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004) .............................. 15

*Brockington v. Dollar Gen. Corp.*, 695 F. Supp. 3d 487 (S.D.N.Y. 2023); ................................. 15

*Canario v. Gunn*, 300 A.D.2d 332 (2d Dep't 2002) ................................................................ 13

*Carroll v. LeBoeuf, Lamb, Greene & McCrae*, 374 F.Supp.2d 375 (S.D.N.Y. 2005) ................... 6

*Chambers v. Time Warner, Inc*., 282 F.3d 147 (2d Cir. 2002) ...................................................... 5

*Clark v. Daby*, 751 N.Y.S.2d 622 (3d Dep't 2002) ............................................................. 15, 16

*Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777 (2012). ............................................................. 15

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ......................................... 10

*Cullum v. Wyndham Hotels & Resorts Corp.*, 2024 WL 552494 (S.D.N.Y. Feb. 12, 2024) .......... 7

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104 (2d Cir. 2010). .................................................. 5

*Duchimaza v. Niagara Bottling, LLC*, 619 F. Supp. 3d 395 (S.D.N.Y. 2022) .............................. 15

*Ezeiruaku v. Am. Express Co.*, 2020 WL 6135794 (S.D.N.Y. Oct. 19, 2020) .............................. 12

*Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453 (S.D.N.Y. 2020) ................................... 8

*Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391 (2d Cir. 2015). ................................... 5

*Holifield v. XRI Inv. Holdings LLC*, 304 A.3d 896 (Del. 2023). ................................................. 13

*In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113 (2d Cir. 2011) ... 7

*In re Mid-Island Hosp., Inc*., 276 F.3d 123 (2d Cir. 2002) ....................................................... 12

*In re Teekay Offshore Partners L.P. Common Unitholders Litig.*, 2021 WL 1227415 (S.D.N.Y. Mar. 31, 2021) ................................................................................................................. 13

*Inspired Cap., LLC v. Conde Nast*, 803 F. App'x 436 (2d Cir. 2020) .......................................... 9

*Kominis v. Starbucks Corp.*, 692 F. Supp. 3d 236 (S.D.N.Y. 2023) ................................... 4, 8, 15

*Lee v. Mondelez Int'l, Inc*., 637 F. Supp. 3d 116 (S.D.N.Y. 2022) .............................................. 9

*Marmelstein v. Kehillat New Hempstead*, 11 N.Y.3d 15 (2008). ................................................. 12

*Meridian Autonomous Inc. v. Coast Autonomous LLC*, 2018 WL 4759754 (S.D.N.Y. Sept. 30, 2018) ............................................................................................................................... 8

*Miller v. HSBC Bank U.S.A., N.A.*, 2015 WL 585589 (S.D.N.Y. Feb. 11, 2015);........................ 14

*New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308 (1995).................................................... 13

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016). ..................................................... 4, 5

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995).
.................................................................................................................................................. 13

*Ross v. Am. Exp. Co.,* 547 F.3d 137 (2d Cir. 2008) ...................................................................... 6

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015). ............ 4

*Seidler v. JPMorgan Chase Bank, N.A.*, 2024 WL 344551 (S.D.N.Y. Jan. 12, 2024) ................ 14

*Simon J. Burchett Photography, Inc. v. Maersk Line Ltd.*, 2021 WL 1040472 (S.D.N.Y. Mar. 18,
2021) ...................................................................................................................................... 4

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401
(S.D.N.Y. 2014). .................................................................................................................... 8

*Spinelli v. Nat'l Football League*, 903 F.3d 185 (2d Cir. 2018) ................................................... 11

*Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31 (2d Cir. 2017) ............................................................. 5

*Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79 (2d Cir. 1999)....................................................... 9, 10

*Tarazi v. Truehope Inc.*, 2017 WL 5957665 (S.D.N.Y. July 28, 2017),.................................... 4, 7

*TCA Television Corp. v. McCollum*, 151 F. Supp. 3d 419 (S.D.N.Y. 2015) ................................. 4

*Travelex Currency Servs., Inc. v. Puente Enters., Inc.*, 2019 WL 1259102 (S.D.N.Y. Mar. 19,
2019) .................................................................................................................................... 10

*Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304 (S.D.N.Y. 2011)............................................. 13

*Wheeler v. Topps Co., Inc.*, 652 F. Supp. 3d 426 (S.D.N.Y. 2023) ............................................. 15

## STATUTES

9 U.S.C. § 2. ................................................................................................................................... 5

## RULES

Fed. R. Civ. P. 9. ............................................................................................................................. 4

Fed. R. Civ. P. 81. ........................................................................................................................... 3

Defendant Suraj Maraboyina respectfully submits this Memorandum of Law in support of his motion to dismiss the Complaint, Dkt. 1-5.

## **INTRODUCTION**

This case should be dismissed. Plaintiffs complain about an investment they made in a film project called *Night Comes*. The allegations purport to sound in fraud, but the barebones Complaint contains next to no facts about what Plaintiffs say Defendant did. The shortage of facts in the Complaint is no accident. Plaintiffs' allegations are intentionally vague to avoid revealing the truth: Defendant is complying with the terms of *written agreements that at least two of the Plaintiffs signed* that govern the investments at issue. Those Production Financing Agreements contain terms that are fundamentally different from those alleged in the Complaint, disclaim any fiduciary relationship between the parties, and mandate arbitration California of any disputes arising out of or related to that agreement. The claims of Plaintiffs Drop a Piano and Adam Reback should be dismissed in favor of arbitration on that basis alone.

But all of Plaintiffs' claims are deficiently pleaded and should be dismissed. *First,* Plaintiffs' fraud claim should be dismissed for failure to allege that Defendant acted with any fraudulent intent. *Second,* Plaintiffs' breach of fiduciary duty claim fails because Plaintiffs do not allege any facts to support their contention that Defendant owed them fiduciary duties (which are specifically disclaimed in the signed agreements). *Third,* Plaintiffs' claim under Section 349 of New York's General Business Law fails because the Complaint contains no facts to suggest that Defendant's conduct in this private transaction was "consumer-oriented" (and it was not). *Lastly*, Plaintiffs' unjust enrichment claim is impermissibly duplicative of their other claims and does not allege that Defendant was enriched. Plaintiffs' deficient allegations require dismissal of the Complaint pursuant to Rule 12(b)(6) and Rule 9.

## FACTUAL ALLEGATIONS[1]

The Complaint alleges the following. "In or around December 2024, Defendant solicited Plaintiffs to invest $125,000 each in a purported Series A equity stake in a film project titled *Night Comes*." Compl. ¶ 9. At an unspecified place and time, by unspecified means of communication, Defendant allegedly represented that Plaintiffs' investments "would secure direct Series A investor status, entitle the investor to a 20% return in approximately four months, and be prioritized upon the project reaching a $3 million investment threshold." *Id.* ¶ 10.[2]

Plaintiffs allege that they "collectively wired $375,000 to Defendant, which funds were directed solely into 131 Productions" in reliance on the above representations. *Id.* ¶ 12.[3] Plaintiffs make no allegation about any written agreement with Defendant or "131 Productions" concerning their investment. In fact, the Complaint contains no additional information about the terms of Plaintiffs' hundred-thousand-dollar investment in *Night Comes.*

Plaintiffs allege that, after wiring the funds to Defendant, they "received no confirmation of direct Series A status in *Night Comes*, no documentation of investment rights, and no return of funds." *Id.* ¶ 13. Plaintiffs do not allege that they sought any documentation of their investment rights or that they requested a return of funds from Defendant or anyone else. Plaintiffs also do not

---

[1] Defendant disputes Plaintiffs' characterization of the business transaction between the parties and denies all allegations of wrongdoing in the Complaint but treats all factual allegations as true for purposes of this motion.

[2] Plaintiffs also allege that Defendant "told" Drop a Piano that it would receive "production support from Impossible Dream Entertainment" for a separate project called *Good* "only if it invested in *Night Comes*." *Id.* ¶ 11. But the Complaint makes no further allegations about *Good* or Impossible Dream Entertainment. Nor does it explain what connection, if any, Defendant has to Impossible Dream Entertainment. This allegation is thus irrelevant to any of Plaintiffs' causes of action.

[3] Defendant is not aware of any entity called 131 Productions, Inc. *See* Dkt. 1-9 ¶¶ 5. This is likely an incorrect reference to the entity that is the contracting party—131 Pictures LLC—for whom Defendant signed.

allege that Defendant made any representations about those particular issues. Plaintiffs allege instead that, "[o]ver the following year," Defendant "provided Plaintiffs with repeated, unsubstantiated assurances that returns were imminent, while failing to provide any accounting, return timeline, or substantive documentation." *Id.* ¶ 14. There are zero specifics about what was actually conveyed, to whom it was conveyed, or when it was conveyed.

According to Plaintiffs, they later discovered through "direct contact with the producers of *Night Comes*" that: (a) "Only 131 Productions, not Plaintiffs, held rights in *Night Comes*"; (b) "The $3 million dollar threshold was not met"; (c) "Only $960,000 of a promised $6.5 million by *Night Comes* by 131 Productions—required by separate agreement to trigger ownership in Night Comes by any investment in Night Comes through 131 Productions – had been delivered by [Defendant]." *Id.* ¶ 15. The Complaint does not specify when, where, or by what means Plaintiffs received this information and does not explain what "rights" are intended to mean.

Plaintiffs contend that the above allegations state claims for common law fraud, breach of fiduciary duty, violation of New York General Business Law § 349, and unjust enrichment, and entitle them to damages of at least $1,375,000. Compl. ¶¶ 16-31 & p. 5 (prayer for relief). They are wrong.

## **LEGAL STANDARD**

The Federal Rules of Civil Procedure "apply to a civil action after it is removed from a state court." Fed. R. Civ. P. 81(c)(1).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Plaintiffs must plead factual content for each element of the claim asserted[.]" *TCA Television Corp. v. McCollum*, 151 F. Supp. 3d 419, 425 (S.D.N.Y. 2015) (cleaned up).

Further, a plaintiff alleging common law fraud must satisfy both the facial plausibility standard of Rule 12(b)(6) and the heightened pleading standard of Rule 9(b). *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). Rule 9(b) requires that the allegations "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To meet this requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Kominis v. Starbucks Corp.*, 692 F. Supp. 3d 236, 254 (S.D.N.Y. 2023) (cleaned up).

Moreover, "when it is apparent—on the face of the complaint and documents properly incorporated therein—that claims are subject to arbitration, a district court may dismiss in favor of arbitration without the delay of discovery." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016). A party may move to dismiss in favor of an arbitration clause in lieu of moving to compel arbitration. *See Tarazi v. Truehope Inc.*, 2017 WL 5957665, at *7 (S.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 5957745 (S.D.N.Y. Nov. 30, 2017). "Where a party moves to dismiss based on an arbitration clause but does not also manifest an intention to compel arbitration, the applicable standard is that of a motion to dismiss made pursuant to Rule 12(b)(6) for failure to state a claim." *Simon J. Burchett Photography, Inc. v. Maersk Line Ltd.*, 2021 WL 1040472, at *2 (S.D.N.Y. Mar. 18, 2021) (citing *Nicosia*, 834 F.3d at 230).

In determining whether a claim meets those standards, the Court must "accept all factual allegations as true, but give no effect to legal conclusions couched as factual allegations.'" *Stadnick*

*v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (cleaned up). The Court must confine its analysis to facts stated in the complaint, documents appended to the complaint or incorporated by reference, and documents that are "integral" to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A document is "integral" to the complaint where a plaintiff has relied on its "terms and effects" in drafting the complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

## ARGUMENT

### I. THE COMPLAINT SHOULD BE DISMISSED AGAINST DROP A PIANO AND REBACK IN FAVOR OF THE MANDATORY ARBITRATION CLAUSE IN THE PARTIES' AGREEMENTS

Plaintiffs move to dismiss the Complaint against Plaintiffs Drop a Piano and Adam Reback in favor of the arbitration clause in the Production Financing Agreements.[4] Where parties are bound to an arbitration agreement, courts are instructed to favor arbitration as a form of dispute resolution. *See* 9 U.S.C. § 2. "In deciding whether a dispute is arbitrable, [the court] must answer two questions: (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015). Here, the answer to both questions is yes.

*First*, there can be no doubt that the parties agreed to arbitrate. Both Drop a Piano and Adam Renack signed a Production Financing Agreement containing a mandatory arbitration clause on December 5, 2024.[5] Defendant signed each of those agreements on behalf of 131 Pictures, as

---

[4] Where, as here, a defendant neither seeks an order compelling arbitration nor indicates that he will seek to force Plaintiffs to arbitrate in the future, the court should construe the motion as a motion to dismiss not a motion to compel arbitration. *See Nicosia,* 834 F.3d at 230. As discussed below, Defendant seeks dismissal of this complaint as meritless.

[5] Defendant Plaintiff Monique Thacker was sent and is also believed to have signed the same Production Financing Agreement with an arbitration clause. As of today's date, Defendant has been unable to locate the signed copy because his assistant is getting married today. The assistant

its CEO and President. *See* Ex. 1 at 10 (signature page); Ex. 2 at 10 (same). Defendant is entitled to enforce the arbitration provision even though he was not directly a party to the underlying agreement. "[A] non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed, and the issues that had arisen among them discloses that the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Ross v. Am. Exp. Co.,* 547 F.3d 137, 143 (2d Cir. 2008) (cleaned up). That principle applies here because the instant dispute between Plaintiffs and Defendant is plainly intertwined with the Production Financing Agreement, and Defendant was the authorized signatory on behalf of 131 Pictures.

Plaintiffs should be estopped from avoiding arbitration with Defendant because it was foreseeable that any dispute about the investment in *Night Comes* would involve Defendant (the CEO and President of 131 Pictures) and be subject to the arbitration clause. *See Birmingham Assocs., Ltd. v, Abbott Labs.*, 547 F.Supp.2d 295, 304 (S.D.N.Y. 2008) (holding that signatory investor was estopped from avoiding arbitration with non-signatory-parent company which "was directly involved in negotiating" contract containing arbitration clause); *Carroll v. LeBoeuf, Lamb, Greene & McCrae*, 374 F.Supp.2d 375, 378 (S.D.N.Y. 2005) (holding that plaintiffs were estopped from avoiding arbitration with non-signatories because signatory plaintiffs "specifically and repeatedly allege" that signatory defendant "acted at all relevant times [as] the agent" of non-signatory defendants).

---

is believed to know the location of the signed agreement. In the event Defendant is able to locate the signed copy of the agreement, he will file it as a supplement to this brief and urge the same relief against Thacker.

*Second,* the arbitration provision plainly encompasses the instant dispute. "Any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113, 117 (2d Cir. 2011). Here, the Arbitration clause is both mandatory and broad in scope:

> **17. Arbitration**. Any controversy, claim, or dispute arising out of or related to this Agreement or the interpretation, performance, or breach hereof shall be submitted for binding and final resolution to the Los Angeles office of JAMS, or its successor ("**JAMS**"), shall be heard before a single neutral arbitrator, and shall be initiated and conducted according to the then-current JAMS Arbitration Rules and Procedures, in effect as of the date hereof.

Ex. 1 § 17; Ex. 2 § 17.

Plaintiffs cannot reasonably dispute that this Action "aris[es] out of" and "relate[s] to" the agreements that they signed to memorialize their investments in *Night Comes.* The first paragraph of the Production Financing Agreement acknowledges that the parties entered into the agreement "in connection with the production and exploitation of that certain proposed feature-length theatrical motion picture currently entitled 'Night Comes' (the 'Picture')." Ex. 1 at 1; Ex. 2 at 1. The agreement memorializes each Plaintiff's commitment to invest $125,000 in that project. Ex. 1 at 10; Ex. 2 at 10. It also governs the terms according to which each Plaintiff will be compensated for their investment. Ex. 1 § 2 (Financing), § 6 (Recoupment of Financier Equity Investment); Ex. 2 § 2 (Financing), § 6 (Recoupment of Financier Equity Investment). In short, these agreements encompass the representations and promises that Defendant made to Plaintiffs about their investments. Plaintiffs' Complaint alleges that those representations were false and that Defendant failed to comply with those promises. This Complaint therefore falls within the scope of the arbitration provision to which the parties agreed. Accordingly, the claims brought by Drop a Piano and Adam Reback should be dismissed in favor of arbitration. *See Tarazi*, 2017 WL 5957665, at *7 (S.D.N.Y. July 28, 2017) (dismissing claims in favor of arbitration clause); *Cullum v. Wyndham Hotels & Resorts Corp.*, 2024 WL 552494, at *7 (S.D.N.Y. Feb. 12, 2024) (same), *aff'd,* 2025 WL

2020942 (2d Cir. Apr. 10, 2025); *Meridian Autonomous Inc. v. Coast Autonomous LLC*, 2018 WL 4759754, at *3 (S.D.N.Y. Sept. 30, 2018) (same).

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON LAW FRAUD

Plaintiffs fail to state a plausible claim for common law fraud for at least two reasons. *First*, Plaintiffs make no allegation that that Defendant acted with the requisite scienter. *Second*, the barebones allegations in the Complaint come nowhere close to compliance with the particularity pleading requirements of Rule 9(b).

To state a claim of common law fraud under New York law, plaintiffs must allege "(1) a material misstatement, (2) known by the perpetrator to be false, (3) made with an intent to deceive, (4) upon which the plaintiff reasonably relies, and (5) damages." *Kominis*, 692 F. Supp. 3d at 254.

### A. Plaintiffs Make No Allegations of Scienter.

Plaintiffs fail to allege any facts about Defendant's intent or scienter. Under New York law, a plaintiff bringing a claim for common law fraud must plead scienter. *See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446 (S.D.N.Y. 2014). The scienter element for common law fraud "is essentially the same as that under federal securities laws." *Id.* To meet that standard, the Plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 472 (S.D.N.Y. 2020). "This inference may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (citation omitted).

The Complaint here pleads no such facts. Indeed, Plaintiffs do not plead *any* facts about Defendant's intent. There is only one allegation about Defendant's state of mind: "Defendant knowingly made misrepresentations of existing facts to induce Plaintiffs to invest." Compl. ¶ 17. Plaintiffs allege no facts to support that conclusory assertion. Regardless, knowledge of falsity

does not suffice to establish scienter. *See Lee v. Mondelez Int'l, Inc.*, 637 F. Supp. 3d 116, 138–39 (S.D.N.Y. 2022) (finding plaintiff had not adequately alleged scienter for a common law fraud claim where complaint merely claimed that defendant knew its representations were false); *see also Kominis*, 692 F. Supp. 3d at 256 (dismissing claims of fraud because plaintiffs' "conclusory allegations" failed to plead scienter).

### B. Plaintiffs' Barebones Allegations Run Afoul of Rule 12 and Rule 9(b)

Not only have Plaintiffs failed to plead scienter, they have also failed to plead any misstatements with the particularity required by Rule 9(b). Plaintiffs fail to adequately plead that Defendant made any false statements because the Complaint does not "state where and when [those] statements were made." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 84 (2d Cir. 1999). The Complaint is silent on location and contains a single allegation about time. Plaintiffs allege only that Defendant "solicited" their investment "[i]n or around December 2024." *Id.* ¶ 9 But Plaintiffs but do not specify the date(s) on which the alleged representations were made, where they were made, or how they were communicated. Did Defendant make all of these representations in a single communication? Was that communication oral or written? Did Defendant make the same representations to each Plaintiff? Or did he communicate to them as a group? The Complaint provides no insight into these basic facts.

Courts in the Second Circuit have consistently held that such generally pleaded allegations—that do not specify the who, what, where, or when of fraud—do not satisfy Rule 9(b). *See Inspired Cap., LLC v. Conde Nast*, 803 F. App'x 436, 440 (2d Cir. 2020) (holding that plaintiff's allegation of "an alleged misstatement, at an unidentified location, on an unidentified date" "clearly does not satisfy [Rule 9(b)'s] standard" and affirming dismissal of fraud claims); *Travelex Currency Servs., Inc. v. Puente Enters., Inc.*, 2019 WL 1259102, at *6 (S.D.N.Y. Mar.

19, 2019) (dismissing fraud claim where party failed to allege "where the promises ... occurred; [or] the form in which the promises were made (*e.g.*, whether such promises were oral or written)").

Worse still, Plaintiffs do not adequately "explain why" the alleged statements "were fraudulent" when made, another requirement of Rule 9(b). *Stevelman*, 174 F.3d at 84. Plaintiffs allege that Defendant made three statements that later proved false: (1) that Plaintiffs' investments would entitle them to "Series A investor status" in *Night Comes*; (2) that Plaintiffs would be entitled to "a 20% return in approximately four months;" and (3) that those returns would be "prioritized upon the project reaching a $3 million investment threshold." Compl. ¶¶ 10, 17. Plaintiffs have not met their burden of pleading that *any* of those statements are false. Additionally, Plaintiffs do not allege that anything that Defendant said was something he knew was false at the time. That, too, is fatal to their claim.

Plaintiffs' contentions should be disregarded because they are contradicted by the written agreements. *See* Ex. 1-2.[6] By its plain terms, the Production Financing Agreement does not entitle investors to "Series A status" or direct equity in *Night Comes*. Plaintiffs are entitled, instead, to receive a "pro rata portion, based on their respective invested amounts" of 80% of the "Net Profit Share" of 131 Pictures, LLC. *See* Ex. 1 §2(b). The Net Profit Share is defined as "10% of the net

---

[6] The Court can consider these agreements on this motion, even though Plaintiffs tried to plead around their existence, because they contain terms of the investments that are "integral" to Plaintiffs' claims and are "documents plaintiffs had either in [their] possession or had knowledge of and upon which they relied in bringing suit." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion."). "This principle has its greatest applicability in cases alleging fraud." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

profit share related to the Picture [*Night Comes*], such participation to be further defined in agreements between Company [131 Pictures] and Night Comes Productions." *Id.* In other words, Plaintiffs' investment entitled them to a portion of *131 Pictures'* profits from the film project, rather than *Night Comes*. Those terms are consistent with the information that Plaintiffs claim they "later discovered through direct contact with the producers of *Night Comes*," Compl. ¶ 15. There is no fraud.

The Complaint alleges that Defendant has continued to provide them assurances that the promised returns are imminent. *Id.* ¶ 14. Because those subsequent "assurances" are consistent with the earlier alleged representations, they cannot form the basis for fraud.[7] The Complaint alleges that the "$3 million threshold was not met" as of the unspecified date when Plaintiffs made "direct contact" with the producers of *Night Comes.* That fact does not contradict a specifically pleaded assertion in the Complaint.

The claim for fraud should be dismissed on that basis.

## III.  PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

Plaintiffs fail to state a claim for breach of fiduciary duty because they have not alleged facts sufficient to support the existence of any fiduciary relationship between them and Defendant. The existence of such a relationship is, naturally, an essential element of a breach-of-fiduciary-duty claim. *See, e.g., Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (outlining the elements of a claim for breach of fiduciary duty under New York law).

Here, the Complaint alleges a conventional business transaction in which Plaintiffs agreed to invest money in Defendant's venture. Compl. ¶¶ 9-10. "In New York, 'a conventional business

---

[7] Moreover, the Production Financing Agreement provides that investors are entitled, "*from all amounts paid to* [*131 Pictures*]," to recoup their investment "plus a preferred return … equal to 20% of the Financier Equity Investment from the Collected Gross Receipts of the Picture." Ex. 1 § 6 (emphasis added).

relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must show special circumstances that transformed the parties' business relationship into a fiduciary one.'" *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 273 n.57 (S.D.N.Y. 2014) (quoting *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 954 N.Y.S.2d 141, 144 (2d Dep't 2012)), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015). In an arms-length commercial transaction such as the one alleged, "no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002); *accord Ezeiruaku v. Am. Express Co.*, 2020 WL 6135794, at *4 (S.D.N.Y. Oct. 19, 2020).

Plaintiffs have pled no such special or extraordinary circumstances. The Complaint does not allege any facts to suggest that the transaction was anything other than a conventional business relationship. Plaintiffs attempt to establish a fiduciary relationship through a single allegation that "Defendant assumed discretionary control over Plaintiffs' capital and had superior access to material investment information." Compl. ¶ 21. That conclusory allegation is not supported by any facts.

A plaintiff cannot show that a fiduciary relationship existed "by merely stating, in a conclusory fashion, that [a defendant] acted as a fiduciary and that a relationship of trust existed." *Marmelstein v. Kehillat New Hempstead*, 11 N.Y.3d 15, 21 (2008). Rather, it is incumbent on a plaintiff to "articulate specific facts that will allow a court to distinguish a viable claim of breach of fiduciary duty" from nonactionable conduct. *Id.* at 21-22. Plaintiffs have not alleged any such facts. Their claim should be dismissed for that reason.

Plaintiffs' breach-of-fiduciary-duty claim should be dismissed for the additional reason that the parties' agreement expressly disclaims such duties:

20. **No Partnership.** This Agreement does not establish a relationship of partners or joint venture between Company and Financier; and neither party shall hold itself out as agent or authorized representative of the other, *nor shall there be any fiduciary or other legal relationship of trust established between Company and Financier hereunder.*

Ex. 1 § 20 (emphasis added). That agreement is governed by Delaware law, *id.* § 21, and Delaware courts enforce unambiguous contractual disclaimers of fiduciary duty like the one here. *See, e.g., Holifield v. XRI Inv. Holdings LLC*, 304 A.3d 896, 922 (Del. 2023). So do New York Courts, whether applying Delaware or New York law. *See In re Teekay Offshore Partners L.P. Common Unitholders Litig.*, 2021 WL 1227415, at *14 (S.D.N.Y. Mar. 31, 2021) (granting motion to dismiss claim for breach of contractual duty based in part on contractual disclaimer of such duties) (Delaware law); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 326 (S.D.N.Y. 2011) ("Under New York law, contractual disclaimers of fiduciary duty are enforceable when sufficiently explicit."). The disclaimer of a fiduciary relationship is fatal to Plaintiff's claims for breach of fiduciary duty.

## IV. PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 349 OF NEW YORK'S GENERAL BUSINESS LAW

Plaintiffs have not adequately pled a violation of Section 349 of New York's General Business law because they do not allege that Defendant's actions involved consumers. Section 349 "is directed at wrongs against the consuming public." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). A claim brought under that statute must, "as a threshold matter, ... charge conduct of the defendant that is consumer-oriented"—defined as conduct that has "a broader impact on consumers at large." *Id.* Accordingly, "[p]rivate contract disputes, unique to the parties … [do] not fall within the ambit of the statute." *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 320 (1995) (cleaned up). In other words, there is no claim under Section 349 where the private transaction does not have "ramifications for the public at large." *Canario v. Gunn*, 300 A.D.2d 332, 333 (2d Dep't 2002) (affirming dismissal of § 349 claim

where "misrepresentation had the potential to affect only a single real estate transaction involving a single unique piece of property" and only the parties "were truly affected by the alleged misrepresentation").

Those precedents mandate dismissal of Plaintiffs' GBL § 349 claim. The alleged transaction was a private investment negotiated between a film producer and three investors. *See* Compl. ¶¶ 9-12. Plaintiffs do not allege that Defendant solicited investments from anyone other than them, let alone from the public at large. Plaintiffs do not allege that Defendant's purported misrepresentations were directed at anyone but them. Although Plaintiffs assert that Defendant's "misleading" conduct was "consumer-oriented," Compl. ¶ 24, that allegation is "unsupported by factual detail to plausibly suggest the existence of a routine policy or practice that affects the consuming public." *Seidler v. JPMorgan Chase Bank, N.A.*, 2024 WL 344551, at *5 (S.D.N.Y. Jan. 12, 2024) (recommending dismissal of plaintiffs' GBL § 349 claim), *report and recommendation adopted*, 2024 WL 343299 (S.D.N.Y. Jan. 30, 2024).

Where, as here, "a plaintiff makes only conclusory allegations of impact on consumers at large, a GBL § 349 claim must be dismissed." *Miller v. HSBC Bank U.S.A., N.A.*, 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015); *see also 123RF LLC v. HSBC Bank USA, N.A.*, 663 F. Supp. 3d 391, 403 (S.D.N.Y. 2023) (conclusory statements that conduct by defendant was consumer-oriented are insufficient to survive dismissal).

Plaintiffs' failure to plausibly allege consumer-oriented conduct mandates dismissal of their third cause of action.

## V. PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT

Plaintiffs' claim for unjust enrichment should be dismissed for two reasons. *First,* that claim is impermissibly duplicative because is based on the same facts as Plaintiffs' other three

claims. *Second*, the Complaint fails to allege that Defendant was enriched by Plaintiffs' investment.

To establish unjust enrichment, a plaintiff must show that (1) "the defendant was enriched"; (2) "at the plaintiff's expense"; and (3) "equity and good conscience" requires restitution for what the plaintiff seeks to recover. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 751 N.Y.S.2d 622 (3d Dep't 2002)). Under New York law, "unjust enrichment is not a catchall cause of action to be used when others fail," but rather "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).

## A.  The Unjust Enrichment Claim Should Be Dismissed as Duplicative

Pursuant to that caselaw, courts in this district will dismiss unjust enrichment claims that are "based on the same facts and theories" as other statutory or tort claims alleged in the same complaint. *Brockington v. Dollar Gen. Corp.*, 695 F. Supp. 3d 487, 516 (S.D.N.Y. 2023); *see Kominis*, 692 F. Supp. 3d at 253 ("Courts regularly dismiss unjust enrichment claims as duplicative of NYGBL claims when an operative pleading fails to meaningfully distinguish the two."); *Wheeler v. Topps Co., Inc.*, 652 F. Supp. 3d 426, 435 (S.D.N.Y. 2023) (dismissing unjust enrichment claim as duplicative of "conventional contract and tort claims" where all claims were "based on the same alleged acts and omissions by Defendant"); *Duchimaza v. Niagara Bottling, LLC*, 619 F. Supp. 3d 395, 419-20 (S.D.N.Y. 2022) (dismissing unjust enrichment claim and

collecting cases). An unjust enrichment claim should be dismissed as duplicative even when the other claims in the Complaint are dismissed pursuant to the same motion. *See, e.g., id.*

Here, Plaintiffs make no attempt to distinguish the unjust enrichment claim from their other claims. Rather, the Complaint makes clear that Plaintiff's fourth cause of action is based on the same course of conduct as the other three—Defendant's alleged failure to provide Plaintiffs with the consideration for which they made their investment. Compl. ¶¶ 28-31. That duplication mandates dismissal.

## B. Plaintiffs Do Not Allege That Defendant Retained Any Benefit From Their Investment

Even if the unjust enrichment claim were not improperly duplicative, it should still be dismissed because Plaintiffs fail to allege that Defendant was "enriched" at Plaintiffs' expense. The Complaint does not allege how Defendant retained a benefit from Plaintiffs' investment. Because Plaintiffs have failed to plead that Defendant retained any benefit they conferred on him, the unjust enrichment must be dismissed. *See Clark*, 751 N.Y.S.2d at 624 (dismissing unjust enrichment claim where facts supported only a "purely incidental" benefit to defendant).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court dismiss the Complaint in its entirety.

Dated: October 24, 2025

Respectfully submitted,

*/s/ Jamie Hoxie Solano*
**DYNAMIS LLP**
Jamie Hoxie Solano
Tyler Finn
11 Park Place, 4th Floor
New York, New York 10007
Tel: (973) 295-5495
jsolano@dynamisllp.com

tfinn@dynamisllp.com

*Attorneys for Defendant Suraj Maraboyina*

**CERTIFICATE OF SERVICE**

I certify that on October 24, 2025, I caused the foregoing brief to be served upon all Filing

Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system.

*/s/ Jamie Hoxie Solano*
Jamie Hoxie Solano

**CERTIFICATE OF COMPLIANCE**

I certify that this memorandum of law contains 5,141 words and complies with the word-length limitations in Local Rule 7.1(c).

*/s/ Jamie Hoxie Solano*
Jamie Hoxie Solano

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DROP A PIANO PRODUCTIONS LLC,
ADAM REBACK, AND MONIQUE
THACKER,

  *Plaintiffs*,

v.

SURAJ MARABOYINA

    *Defendant*.

No. 25-CV-8631 (JPC)

**DECLARATION OF JAMIE HOXIE SOLANO IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS**

    I, Jamie Hoxie Solano, declare under penalty of perjury that the following is true and correct:

    1.    I am over the age of twenty-one (21) years and a partner at Dynamis LLP. I am counsel of record for Defendant Suraj Maraboyina in the above-captioned litigation. I submit this declaration in support of Defendant's Motion to Dismiss.

    2.    I am competent to testify to the matters stated herein, have personal knowledge of the facts and statements in this declaration, and each of the facts and statements is true and correct.

    3.    Attached hereto as Exhibit 1 is a true and correct copy of the December 5, 2024 Production Financing Agreement executed by Drop a Piano Productions LLC and 131 Pictures LLC.  This agreement has been redacted, pursuant to Federal Rule of Civil Procedure 5.2(a), to remove reference to financial account numbers.

4.      Attached hereto as Exhibit 2 is a true and correct copy of the December 5, 2024 Production Financing Agreement executed by Adam J. Reback and 131 Pictures LLC.  This agreement has been redacted, pursuant to Federal Rule of Civil Procedure 5.2(a), to remove reference to financial account numbers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 24th day of October, 2025, in Berkeley Heights, New Jersey.


/s/ *Jamie Hoxie Solano*
Jamie Hoxie Solano

Exhibit 1

## PRODUCTION FINANCING AGREEMENT

### "Night Comes"

This Production Financing Agreement (this "**Agreement**") is entered into as of December 5, 2024 by and between the undersigned financier Drop A Piano Productions ("**Financier**") and 131 Pictures, LLC, a Delaware limited liability company ("**Company**"), in connection with the production and exploitation of that certain proposed feature-length theatrical motion picture currently entitled "Night Comes" (the "**Picture**").

## RECITALS

A.    Company desires to obtain production financing from Financier, and potentially from other financiers ("**Other Financiers**") for the production of the Picture, as hereinafter provided.

B.    Financier desires to contribute and provide all or a portion of the financing for the production of the Picture in the amount set forth on the signature page to this Agreement on the line entitled "Financier Equity Commitment" (as may be adjusted as provided herein, the "**Financier Equity Investment**"), which will be repaid, if ever, from the Collected Gross Receipts (as defined below), if any, of the Picture.

C.    Financier is ready, willing and able to provide the Financier Equity Investment, subject to the terms and conditions set forth below.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Financier hereby agree as follows:

1.    **NIGHT COMES PRODUCTIONS INC**.  [Night Comes Productions] and/or one or more affiliates thereof (collectively, "**Night Comes Productions**") shall produce the Picture, shall be the owner of the copyright in the Picture and all worldwide distribution rights in the Picture, and shall enter into all distribution and license agreements in the name of Company or such wholly owned subsidiary (or with respect to certain foreign territories, through intermediary companies).  Company shall cause all of the Financier Equity Investment to be invested in Night Comes Productions in accordance with the Budget (as defined below) and a funding schedule to be mutually agreed by Company and Night Comes Productions.

2.    **Financing**.

(a)    The budget of the Picture ("**Budget**") shall be mutually approved by Company and Night Comes Productions, and is expected to be approximately US $10,700,000, inclusive of contingency and all financing fees, completion guarantor fees and expenses, and all other production costs of whatsoever nature.

(b)      The Company shall be entitled to receive 10% of the net profit share related to the Picture, such participation to be further defined in agreements between Company and Night Comes Productions ("**Company's Net Profit Share**"). Financier, together with any Other Financiers, shall be entitled to receive their pro rata portion, based on their respective invested amounts, of 80% of Company's Net Profit Share ("**Financier's Share**").

(c)      Until such time as principal photography of the Picture commences, Company may return to Financier all or any portion of its Financier Equity Investment for any reason without interest or penalty, including due to the receipt of the aforementioned alternative sources of financing. As used in this Agreement, the Financier Equity Investment means the amount of capital invested by Financier and not returned to Financier prior to the commencement of principal photography of the Picture, and Financier's "**Investment Percentage**" means the percentage derived by dividing Financier's Equity Investment by the aggregate of capital invested by Financier and all Other Financiers and not otherwise returned to any such person prior to the commencement of principal photography of the Picture.

(d)      Company shall have the right to enter into financing agreements with Other Financiers on terms selected by Company in its sole discretion. Financier shall have no right to approve the identity of any Other Financier or the terms on which financing is obtained from any such Other Financier.

3.      **[Intentionally Omitted]**.

4.      **Funding Account**.  Financier shall fund the Financier Equity Investment into the following bank account upon execution of this Agreement[1]:

|                  |                      |
| ---------------- | -------------------- |
| Bank Name:       | Chase                |
| Bank Address:    | 270 Park Avenue      |
|                  | New York, NY 10017   |
|                  |                      |
| Swift Code:      | CHASUS33             |
| Account Number:  | FRCP 5.2(a)          |
| Account Name:    | 131 Pictures, LLC    |

5.      **CAMA**.  Company shall be a party to a collection account management agreement (the "**CAMA**") (currently expected to be Freeway) (the entity so appointed, the "**Collection Agent**"), providing for payment of all distribution proceeds into an account designated by the Collection Agent (the "**Collection Account**").

6.      **Recoupment of Financier Equity Investment**.   From all amounts paid to Company other than Excluded Funds, Financier shall be entitled to (a) first, recoup

---

[1] **NTD**: 131 Pictures to confirm details.

the Financier Equity Investment plus a preferred return (the "**Financier Preferred Return**") equal to 20% of the Financier Equity Investment from the Collected Gross Receipts of the Picture, and (b) second, participate in Financier's Share. Company shall pay Financier its share of Collected Gross Receipts pursuant to the terms hereof. Collected Gross Receipts will be deposited into the Collection Account and Company shall remit to the Financier amounts to which Financier may be entitled to receive within thirty (30) days after Company's receipt of its share of Collected Gross Receipts from the Collection Agent.

7.    **No Approvals and Controls**.

(a)    Financier shall not have any approval of any deferred compensation and/or box office bonuses and/or other similar amounts (however described) payable to producers, cast, crew and/or any other third party. To the extent Company has any such approval rights, Company may exercise such right in its sole discretion.

(b)    Financier shall have no right to make any business decisions relating to the Picture, including marketing and distribution. To the extent Company has any such right, Company may exercise such right in its sole discretion.

8.    **No Subsequent Productions**.  Financier shall have no right to participate in any subsequent productions (each, a "**Subsequent Production**") based upon and/or derived from the Picture, including, without limitation, remakes, sequels, prequels, series, stage plays and musicals.

9.    **Audit**.  Financier shall have the right to inspect the books and records of Company (and any parent, subsidiary, or affiliate of the foregoing, which shall not include Night Comes Production's) in connection with the Picture not more than once annually. Any such audit shall be conducted only by a reputable certified public accountant during reasonable business hours upon thirty (30) days prior written notice and, provided that Company fully cooperates, shall not continue for more than thirty (30) consecutive days. If any such audit reveals material accounting errors of ten percent (10%) or more, Company shall be responsible for the fees and costs of such audit.

10.    **Representations and Warranties of Company**.  Company hereby represents and warrants to Financier as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

(a)    Company is a limited liability company duly organized and now existing in good standing formed under the laws of the State of Delaware and has the power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by Company in connection with the Picture and this Agreement

were duly authorized and constitute valid, binding and enforceable actions and obligations of Company.

(b)    Company has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and all documents, instruments and agreements to be executed and/or delivered by Company hereunder, and has taken all necessary corporate or partnership action to authorize the execution, delivery and performance thereof.

(c)    The execution, delivery and performance of this Agreement and all other documents, instruments and agreements to be executed or delivered pursuant hereto, and the consummation of the transaction herein contemplated, and compliance with the terms and provisions hereof and thereof will not violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency; will not conflict with or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Company is a party or by which it may be bound or to which it may be subject; will not violate any provision of its certificate of formation or operating agreement; and will constitute legal valid and binding obligations of Company, enforceable against Company in accordance with the respective terms hereof and thereof.

(d)    There are no actions, suits or proceedings, pending or threatened, against, affecting or relating to Company or the Picture before any court or governmental or administrative body, or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition financial or otherwise, of Company or which would otherwise adversely affect the rights granted to Financier hereunder.  Company is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it.

(e)    In connection with the execution, delivery, performance, validity and enforceability of this Agreement and any other instrument, agreement or document to be executed and delivered hereunder, no consent of any person and no consent, license, approval authorization, registration or declaration with any governmental authority, bureau or agency is required.

(f)    No insolvency proceedings of any nature are now pending or threatened by or against Company.

11.    **Representations and Warranties of Financier**.  Financier hereby represents and warrants to Company as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

(a)    Financier is properly able to evaluate the proposed business of Company and the inherent risks therein.

(b)     Financier is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

(c)     Financier has reviewed with its own tax advisor(s) and/or attorney(s) the federal, state, local and foreign tax consequences of this investment and the transaction contemplated by this Agreement and is relying solely on such advisors and <u>not</u> on any statements or representations of Company in connection therewith. Financier understands that Financier, and not Company, shall be solely responsible for Financier's own respective tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

(d)     Financier is fully aware that in agreeing to enter into this Agreement, Company is relying upon the truth and accuracy of the representations and warranties of Financier made herein.

(e)     Financier warrants and represents that it is free to enter into this Agreement and to perform all of the obligations undertaken by Financier hereunder and that it is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to Financier's rights to perform hereunder.

(f)     If Financier is entity, Financier is duly organized and now existing in good standing formed under the laws of the state or country of its incorporation or formation and has the power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by Financier in connection with the Picture and this Agreement were duly authorized and constitute valid, binding and enforceable actions and obligations of Financier.

(g)     If Financier is an entity, Financier has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and all documents, instruments and agreements to be executed and/or delivered by Financier hereunder, and has taken all necessary corporate or partnership action to authorize the execution, delivery and performance thereof.

(h)     The execution, delivery and performance of this Agreement and all other documents, instruments and agreements to be executed or delivered pursuant hereto, and the consummation of the transaction herein contemplated, and compliance with the terms and provisions hereof and thereof will not violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency applicable to Financier; will not conflict with or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Financier is a party or by which it may be bound or to which it may be subject; will not violate any provision of its certificate of formation, operating agreement or equivalent; and will

constitute legal valid and binding obligations of Financier, enforceable against Financier in accordance with the respective terms hereof and thereof.

(i)     In connection with Financier's execution, delivery, performance, validity and enforceability of this Agreement and any other instrument, agreement or document to be executed and delivered hereunder, no consent of any person and no consent, license, approval authorization, registration or declaration with any governmental authority, bureau or agency is required.

(j)     No insolvency proceedings of any nature are now pending or threatened by or against Financier.

(k)     If Financier is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), Financier hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to make the investment contemplated by this Agreement or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the investment, (ii) any foreign exchange restrictions applicable to such investment, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the investment contemplated hereby. Financier's subscription and payment for and continued beneficial ownership of the investment contemplated hereby will not violate any applicable securities or other laws of Financier's jurisdiction.

12.    **<u>Lack of Distribution Agreements</u>**.  The parties hereby acknowledge that there is presently no agreement with any distributor to distribute the Picture. The success of the Picture will be dependent upon Night Comes Production's ability to complete the Picture, the attractiveness of the final product to a distributor and the distributor's willingness to commit substantial sums to promote the Picture successfully. Night Comes Productions will not have the financial capability to distribute the Picture itself. The gross revenue derived from the Picture is dependent, among other things, upon the interest of distributors and their ability to obtain suitable distribution via theatrical, television, home video and/or other media and in selecting proper release dates and appropriate advertising and promotion for the Picture. The negotiation of final distribution agreements, which frequently occurs (if at all) near the time of completion of motion pictures, will have a substantial impact upon the amount of receipts available to Company from the exploitation of the Picture. There is no assurance that such negotiations will result in revenues or profits to Company. Furthermore, there is no assurance that the Picture will be distributed or that such distribution will be profitable to Company. The fact that any distributor derives profits from its distribution of the Picture will not, in turn, assure that Company will also derive profits therefrom.

13. **<u>No Assurance of Return of Financier Equity Investment or Profits</u>**.  Financier has no assurance of receiving a return of the Financier Equity Investment or any profit in excess thereof. Financier has been advised to seek independent legal counsel before making the Financier Equity Investment commitment and fully understands, and can withstand, that there is an extremely high risk of loss associated with making the investment. Financier acknowledges that no assurances, guaranties, representations or warranties have been given that by entering into this Agreement that any recoupment and/or profits will be realized, and Financier is not relying and has not relied on any statements, representations or warranties of any person or entity in making the decision to provide the Financier Equity Investment or to enter into this Agreement. Financier is sophisticated in investment and business matters and is knowingly, voluntarily and intelligently entering into this Agreement.  A more comprehensive list of risk factors is attached hereto as <u>Exhibit A</u>.

14. **<u>Indemnification</u>**.

(a)     Company shall indemnify, defend, and hold Financier and its successors, assigns, affiliates, agents, officers, directors, employees, members, managers, partners and shareholders harmless, against any third party liability, claim, cause of action, damage or expense (including, without limitation, reasonable outside attorneys fees, expert witness fees, disbursements and court costs regardless of whether litigation is commenced) ("**Claims**") arising from a breach of Company's representations and warranties and covenants hereunder, except to the extent such Claims are based on facts or circumstances for which Financier is required to provide indemnity pursuant to clause (b) below.

(b)     Financier shall indemnify, defend and hold Company and its affiliates, and their respective successors, assigns, agents, officers, directors, employees, members, managers, partners and shareholders harmless, against any Claims arising from a breach by Financier of its representations and warranties and covenants hereunder.

15. **<u>Assignment</u>**.  Neither party shall have the right to assign this Agreement or delegate its duties under this Agreement, without the prior written consent of the other party, and any attempted assignment without such consent shall be null and void *ab initio*. Notwithstanding the foregoing, except with respect to Financier's approval rights (if any) to be exercised hereunder, each party shall be free to assign this Agreement, or any part hereof, at any time, to any person or entity, and upon such assignment, the assigning party, as applicable, shall be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (a) a person or entity into which the assigning party, as applicable, merges or is consolidated or (b) a person or entity which acquires all or substantially all of the assigning party's business and assets or (c) a person or entity which is controlled by, under common control with, or controls the assigning party, as applicable.

16. **Further Documents**. Each party shall, at the request of the other party, execute and deliver any additional agreements, documents and instruments reasonably necessary to give effect to the terms of this Agreement.

17. **Arbitration**. Any controversy, claim, or dispute arising out of or related to this Agreement or the interpretation, performance, or breach hereof shall be submitted for binding and final resolution to the Los Angeles office of JAMS, or its successor ("**JAMS**"), shall be heard before a single neutral arbitrator, and shall be initiated and conducted according to the then-current JAMS Arbitration Rules and Procedures, in effect as of the date hereof. The parties will be entitled to discovery on the same basis as in a court proceeding. The arbitrator shall apply Delaware law. Unless otherwise agreed by the parties at the time of any arbitration, the arbitration hearing/proceedings on the merits shall: (1) occur within six (6) months after the initial demand for arbitration is submitted; and (2) last no longer than five (5) hearing days. The prevailing party in the arbitration shall be entitled to its reasonable attorney's fees and its costs. The arbitrator's decision shall be in writing, and shall be final, binding, and shall be enforceable by any court having or acquiring jurisdiction.

18. **Remedies**. In the event of a failure or omission by Company constituting a breach of its obligations hereunder, the damage, if any, caused Financier by such breach is not irreparable or sufficient to entitle Financier to injunctive or other equitable relief. Consequently, Financier's sole rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law and Financier shall not have the right in such event to enjoin or restrain the distribution or exhibition of the Picture, nor to rescind this Agreement, in whole or in part.

19. **Notices**. All notices and/or approvals required or permitted to be given pursuant to this Agreement shall be in writing, and shall be delivered either personally, by overnight delivery service, or by US certified or registered mail, postage prepaid, return-receipt requested and addressed to the parties at their respective addresses as they appear below. Notices and/or approvals may also be given by email to the email addresses which appear in the signature blocks below, provided that either (i) receipt of the email transmission is acknowledged in writing by the receiving party, which may also be by email transmission, or (ii) the transmitting party obtains a written confirmation from its own email transmission, as applicable, showing that the entire transmission was transmitted to the receiving party, without interruption, and a copy of the notice is also sent by one of the other above-described methods of service. The parties may change their addresses or email addresses for notice and/or approval by giving notice of such change in accordance with this section, but neither party shall be entitled to require that the notices be given to it at more than two addresses. Notices and/or approval sent by overnight delivery services shall be deemed received on the business day following the date of deposit with the delivery service. Mailed notices and/or approvals shall be deemed received upon the earlier

of the date of delivery shown on the return receipt, or the fifth business day after the date of mailing.  Notices and/or approvals sent by email shall be deemed served on the date of transmission, provided that such notices are sent prior to 5:00pm in the time zone of the recipient, otherwise on the next business day.  Notwithstanding the foregoing, actual receipt of notice by a party shall constitute notice given in accordance with this Agreement on the date received, unless deemed earlier received pursuant to this section.

20.    **No Partnership**.  This Agreement does not establish a relationship of partners or joint venture between Company and Financier; and neither party shall hold itself out as agent or authorized representative of the other, nor shall there be any fiduciary or other legal relationship of trust established between Company and Financier hereunder.

21.    **Miscellaneous**.  The validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Delaware applicable to contracts entered into and wholly performed entirely therein.  No amendment or modification hereof shall be valid unless contained in a writing signed by both parties.  This Agreement is the entire agreement between the parties, and replaces any prior agreements, understandings, representations or warranties, verbal or written, as to the subject matter hereof.  This Agreement shall bind and inure to the benefit of the parties and their respective permitted assigns, licensees, successors, heirs and representatives.  Each party hereto generally consents to service of process by registered mail, return receipt requested, at the addresses set forth below to receive service of process in any action, suit or proceeding with respect to any matter as to which it has submitted to jurisdiction as set forth above.  The headings of the paragraphs hereof are for convenience only and shall not be deemed to limit or in any way affect the scope, meaning or intent of this Agreement or any portion hereof.  Should any paragraph or provision of this Agreement be held to be void, invalid or inoperative as a result of any judicial or administrative proceeding or decree, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein.  *[Signature page follows]*

**131 PICTURES, LLC**

"Company"

By: _____

Title: CEO and President

Address for Notices:

3903 Hawthorne Avenue, Unit 101

Dallas, TX 75219

Email: suraj@the131group.com

"Financier" Drop a Piano Productions

Name: Monte Albers de Leon

Signature: _____

Financier Equity Commitment: $125,000

Address for Notices:

80 Riverside Drive 5M

New York, NY 10069

This Agreement may be executed in one or more counterparts (including via facsimile or electronic transmission), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

## <u>SCHEDULE 1: DEFINITIONS</u>

Any capitalized terms not defined in this Schedule 1 shall have the same meanings ascribed to them in this Agreement.

"**Collected Gross Receipts**" means all Gross Receipts actually received into the Collection Account.

"**Gross Receipts**" means all amounts from all sources worldwide derived from the distribution and exploitation of the Picture, including all allied, ancillary, derivative (solely with respect to derivative rights payments), and subsidiary revenues from any and all rights, formats and media presently known or hereafter devised and actually received by or credited to Company.

## EXHIBIT A:  RISK FACTORS

The business of Company will be to provide financing for the Picture. In such ventures the risk of loss is high in comparison with the prospects for any profit and that therefore any investment in Company is suitable only for those investors who do not require liquidity in their investment. The production of the Picture by Night Comes Productions is an entirely new and speculative venture, and it is impossible to project or predict whether the Financier Equity Investment will result in a gain or loss to the investors and therefore **ANY POTENTIAL INVESTOR PARTY TO THIS AGREEMENT SHOULD NOT INVEST IN THE PICTURE UNLESS SUCH PARTY IS PREPARED FOR THE POSSIBILITY OF TOTAL LOSS OF THE INVESTMENT.** The success of a film in theatrical distribution, television, home video and other ancillary markets is dependent upon public taste which is unpredictable and susceptible to change. The success of a film may also be significantly affected by the number and popularity of other films being distributed, therefore, the success of a motion picture is impossible to predict and absolutely no assumptions should be made respecting the ultimate economic results which may be realized by the Picture. In addition to the foregoing, the risks of an investment in Company include, without limitation, the following:

(a)    Lack of Control over Production and Exploitation of the Picture. Other than limited approval rights in favor of Company, the production and exploitation of the Picture is controlled by Night Comes Productions. Night Comes Productions is not an affiliate of Company, and Company therefore has no direct or indirect ability to control the actions and decisions of Night Comes Productions. Accordingly, Company's role with respect to the Picture is primarily that of a passive investor.

(b)    Speculative Nature of the Business. The business of the production and exploitation of motion pictures is highly speculative and has historically involved substantial risks. The costs to produce a motion picture are often miscalculated and may be increased by factors beyond the control of its producer, resulting in inability to complete production which would result in abandonment of the project and a total loss of all funds provided therefore. The ultimate profitability of any motion picture depends upon its audience appeal in relation to its cost of production and distribution. Audience appeal, in turn, depends upon unpredictable critical reviews and changeable public taste, among other things, which cannot be readily ascertained in advance. Based upon available information, a majority of completed motion pictures fail to generate sufficient revenues to recover their cost of production and distribution. Accordingly, there can be no assurance that Night Comes Productions will exploit the Picture so as to enable Company to recoup all or any portion of its Financier Equity Investment or to yield a profit on its Financier Equity Investment. Furthermore, until the completion of post-production and the sale of the Picture to a distributor, it is unlikely that Company will derive any revenues from the Picture. In addition, Company cannot predict the timing or amount of revenues, if any, it may derive from the exploitation of the Picture.

(c)    Risks of Motion Picture Production. There are significant risks involved in the production of any motion picture, many of which may materially delay completion of the Picture or make completion impossible. If the Picture is not completed, no revenues

will be derived from the Picture. Such risks include, but are not limited to, production costs exceeding available funds, labor disputes, death or disability of key talent or other key personnel, equipment difficulties, destruction of completed film negatives or unanticipated adverse weather conditions. The occurrence of any such event may cause delays and increase production costs and may have a material adverse effect upon the Financier Equity Investment. These or similar events are beyond the control of Financier, the Other Financiers and/or Company. To the extent that funding sources available to Night Comes Productions are insufficient to cover all production costs of the Picture, all such contributions may be lost.

(d)    Competition. Company intends to engage in a highly competitive business and therefore the Financier Equity Investment contains a high degree of risk. Competition is encountered in different phases of the production and exploitation of a motion picture. In the production phase of the Picture, competition may have a material effect on the employment and cost of personnel. After the completion of its production, the Picture will, upon its distribution, be competing with other motion pictures and, indirectly, with other forms of public entertainment. Such competition in the phases of the production and exploitation of the Picture may have a material adverse impact on Financier's Equity Investment. Many companies involved in the production and exploitation of motion pictures have, from time to time, encountered financial difficulties, which reflect the highly competitive character of, and adverse development in, the motion picture industry as well as the unpredictability of public reaction to motion pictures.

(e)    Single Project Investment. The financial performance of Financier's investment is solely dependent upon the success of the Picture. In addition, the financial performance of the investment in the Picture is dependent upon the ability Night Comes Productions to complete the Picture in a timely and cost-effective manner, the ability of Night Comes Productions to obtain successful theatrical distribution of the Picture and the ultimate audience appeal of the Picture if and when completed.

(f)    Risk of Motion Picture Distribution. Distribution of films requires specialized marketing expertise and considerable financial resources. Company and Night Comes Productions will be dependent on a distributor for this marketing expertise and for providing funds for prints and advertising. Without the participation of a distributor, there is little likelihood that significant revenues from any source will be realized. The participation of a distributor does not, however, guarantee that the distribution will be successful or that substantial revenues will be realized therefrom.

(g)    Changes in the Film Industry. Technological developments have resulted in the availability of alternative distribution mediums for film entertainment, including expanded pay and cable television and videocassettes, DVDs and digital technologies. These alternative distribution mediums typically have different revenue allocation arrangements from one another and such allocation arrangements often vary over time. In recent years, revenues from licensing of films to network television have decreased, revenues from pay television initially increased substantially, then leveled and have

recently begun to fall, and revenues from videocassettes and DVDs and digital platforms have increased significantly while being generated by a smaller group of major titles.

Generally, however, the level of theatrical success remains a critical factor in generating revenues in these ancillary markets.

(h)    <u>Management</u>. Other than as set forth in this Agreement, the investors will not have a right to participate in the management of the business of Company. Accordingly, no prospective investor should invest unless he, she or it is willing to entrust all aspects of management to Company. Further, as described above, Company has a limited ability to control the production and exploitation of the Picture.

(i)    <u>Federal Income Tax Consequences</u>. Company has not been structured to provide tax benefits to investors, and an investment made pursuant to this Agreement should not be based on the expectation that tax benefits will accrue therefrom.

# Exhibit 2

# PRODUCTION FINANCING AGREEMENT

## "Night Comes"

This Production Financing Agreement (this "**Agreement**") is entered into as of December 5, 2024 by and between the undersigned financier Adam J Reback ("**Financier**") and 131 Pictures, LLC, a Delaware limited liability company ("**Company**"), in connection with the production and exploitation of that certain proposed feature-length theatrical motion picture currently entitled "Night Comes" (the "**Picture**").

## RECITALS

A.     Company desires to obtain production financing from Financier, and potentially from other financiers ("**Other Financiers**") for the production of the Picture, as hereinafter provided.

B.     Financier desires to contribute and provide all or a portion of the financing for the production of the Picture in the amount set forth on the signature page to this Agreement on the line entitled "Financier Equity Commitment" (as may be adjusted as provided herein, the "**Financier Equity Investment**"), which will be repaid, if ever, from the Collected Gross Receipts (as defined below), if any, of the Picture.

C.     Financier is ready, willing and able to provide the Financier Equity Investment, subject to the terms and conditions set forth below.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Financier hereby agree as follows:

1.     **NIGHT COMES PRODUCTIONS INC**.  [Night Comes Productions] and/or one or more affiliates thereof (collectively, "**Night Comes Productions**") shall produce the Picture, shall be the owner of the copyright in the Picture and all worldwide distribution rights in the Picture, and shall enter into all distribution and license agreements in the name of Company or such wholly owned subsidiary (or with respect to certain foreign territories, through intermediary companies).  Company shall cause all of the Financier Equity Investment to be invested in Night Comes Productions in accordance with the Budget (as defined below) and a funding schedule to be mutually agreed by Company and Night Comes Productions.

2.     **Financing**.

(a)     The budget of the Picture ("**Budget**") shall be mutually approved by Company and Night Comes Productions, and is expected to be approximately US $10,700,000, inclusive of contingency and all financing fees, completion guarantor fees and expenses, and all other production costs of whatsoever nature.

(b)      The Company shall be entitled to receive 10% of the net profit share related to the Picture, such participation to be further defined in agreements between Company and Night Comes Productions ("**Company's Net Profit Share**"). Financier, together with any Other Financiers, shall be entitled to receive their pro rata portion, based on their respective invested amounts, of 80% of Company's Net Profit Share ("**Financier's Share**").

(c)      Until such time as principal photography of the Picture commences, Company may return to Financier all or any portion of its Financier Equity Investment for any reason without interest or penalty, including due to the receipt of the aforementioned alternative sources of financing. As used in this Agreement, the Financier Equity Investment means the amount of capital invested by Financier and not returned to Financier prior to the commencement of principal photography of the Picture, and Financier's "**Investment Percentage**" means the percentage derived by dividing Financier's Equity Investment by the aggregate of capital invested by Financier and all Other Financiers and not otherwise returned to any such person prior to the commencement of principal photography of the Picture.

(d)      Company shall have the right to enter into financing agreements with Other Financiers on terms selected by Company in its sole discretion. Financier shall have no right to approve the identity of any Other Financier or the terms on which financing is obtained from any such Other Financier.

3.      **[Intentionally Omitted]**.

4.      **Funding Account**.  Financier shall fund the Financier Equity Investment into the following bank account upon execution of this Agreement[1]:

| | |
|---|---|
| Bank Name: | Chase |
| Bank Address: | 270 Park Avenue |
| | New York, NY 10017 |
| | |
| Swift Code: | CHASUS33 |
| Account Number: | FRCP 5.2(a) |
| Account Name: | 131 Pictures, LLC |

5.      **CAMA**.  Company shall be a party to a collection account management agreement (the "**CAMA**") (currently expected to be Freeway) (the entity so appointed, the "**Collection Agent**"), providing for payment of all distribution proceeds into an account designated by the Collection Agent (the "**Collection Account**").

6.      **Recoupment of Financier Equity Investment**.    From all amounts paid to Company other than Excluded Funds, Financier shall be entitled to (a) first, recoup

---

[1] **NTD**: 131 Pictures to confirm details.

the Financier Equity Investment plus a preferred return (the "**Financier Preferred Return**") equal to 20% of the Financier Equity Investment from the Collected Gross Receipts of the Picture, and (b) second, participate in Financier's Share. Company shall pay Financier its share of Collected Gross Receipts pursuant to the terms hereof. Collected Gross Receipts will be deposited into the Collection Account and Company shall remit to the Financier amounts to which Financier may be entitled to receive within thirty (30) days after Company's receipt of its share of Collected Gross Receipts from the Collection Agent.

7. **No Approvals and Controls**.

(a) Financier shall not have any approval of any deferred compensation and/or box office bonuses and/or other similar amounts (however described) payable to producers, cast, crew and/or any other third party. To the extent Company has any such approval rights, Company may exercise such right in its sole discretion.

(b) Financier shall have no right to make any business decisions relating to the Picture, including marketing and distribution. To the extent Company has any such right, Company may exercise such right in its sole discretion.

8. **No Subsequent Productions**. Financier shall have no right to participate in any subsequent productions (each, a "**Subsequent Production**") based upon and/or derived from the Picture, including, without limitation, remakes, sequels, prequels, series, stage plays and musicals.

9. **Audit**. Financier shall have the right to inspect the books and records of Company (and any parent, subsidiary, or affiliate of the foregoing, which shall not include Night Comes Production's) in connection with the Picture not more than once annually. Any such audit shall be conducted only by a reputable certified public accountant during reasonable business hours upon thirty (30) days prior written notice and, provided that Company fully cooperates, shall not continue for more than thirty (30) consecutive days. If any such audit reveals material accounting errors of ten percent (10%) or more, Company shall be responsible for the fees and costs of such audit.

10. **Representations and Warranties of Company**. Company hereby represents and warrants to Financier as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

(a) Company is a limited liability company duly organized and now existing in good standing formed under the laws of the State of Delaware and has the power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by Company in connection with the Picture and this Agreement

were duly authorized and constitute valid, binding and enforceable actions and obligations of Company.

(b)     Company has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and all documents, instruments and agreements to be executed and/or delivered by Company hereunder, and has taken all necessary corporate or partnership action to authorize the execution, delivery and performance thereof.

(c)     The execution, delivery and performance of this Agreement and all other documents, instruments and agreements to be executed or delivered pursuant hereto, and the consummation of the transaction herein contemplated, and compliance with the terms and provisions hereof and thereof will not violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency; will not conflict with or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Company is a party or by which it may be bound or to which it may be subject; will not violate any provision of its certificate of formation or operating agreement; and will constitute legal valid and binding obligations of Company, enforceable against Company in accordance with the respective terms hereof and thereof.

(d)     There are no actions, suits or proceedings, pending or threatened, against, affecting or relating to Company or the Picture before any court or governmental or administrative body, or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition financial or otherwise, of Company or which would otherwise adversely affect the rights granted to Financier hereunder.  Company is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it.

(e)     In connection with the execution, delivery, performance, validity and enforceability of this Agreement and any other instrument, agreement or document to be executed and delivered hereunder, no consent of any person and no consent, license, approval authorization, registration or declaration with any governmental authority, bureau or agency is required.

(f)     No insolvency proceedings of any nature are now pending or threatened by or against Company.

11.     **Representations and Warranties of Financier**.  Financier hereby represents and warrants to Company as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

(a)     Financier is properly able to evaluate the proposed business of Company and the inherent risks therein.

(b)      Financier is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

(c)      Financier has reviewed with its own tax advisor(s) and/or attorney(s) the federal, state, local and foreign tax consequences of this investment and the transaction contemplated by this Agreement and is relying solely on such advisors and not on any statements or representations of Company in connection therewith. Financier understands that Financier, and not Company, shall be solely responsible for Financier's own respective tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

(d)      Financier is fully aware that in agreeing to enter into this Agreement, Company is relying upon the truth and accuracy of the representations and warranties of Financier made herein.

(e)      Financier warrants and represents that it is free to enter into this Agreement and to perform all of the obligations undertaken by Financier hereunder and that it is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to Financier's rights to perform hereunder.

(f)      If Financier is entity, Financier is duly organized and now existing in good standing formed under the laws of the state or country of its incorporation or formation and has the power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by Financier in connection with the Picture and this Agreement were duly authorized and constitute valid, binding and enforceable actions and obligations of Financier.

(g)      If Financier is an entity, Financier has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and all documents, instruments and agreements to be executed and/or delivered by Financier hereunder, and has taken all necessary corporate or partnership action to authorize the execution, delivery and performance thereof.

(h)      The execution, delivery and performance of this Agreement and all other documents, instruments and agreements to be executed or delivered pursuant hereto, and the consummation of the transaction herein contemplated, and compliance with the terms and provisions hereof and thereof will not violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency applicable to Financier; will not conflict with or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Financier is a party or by which it may be bound or to which it may be subject; will not violate any provision of its certificate of formation, operating agreement or equivalent; and will

constitute legal valid and binding obligations of Financier, enforceable against Financier in accordance with the respective terms hereof and thereof.

(i)     In connection with Financier's execution, delivery, performance, validity and enforceability of this Agreement and any other instrument, agreement or document to be executed and delivered hereunder, no consent of any person and no consent, license, approval authorization, registration or declaration with any governmental authority, bureau or agency is required.

(j)     No insolvency proceedings of any nature are now pending or threatened by or against Financier.

(k)     If Financier is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), Financier hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to make the investment contemplated by this Agreement or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the investment, (ii) any foreign exchange restrictions applicable to such investment, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the investment contemplated hereby.  Financier's subscription and payment for and continued beneficial ownership of the investment contemplated hereby will not violate any applicable securities or other laws of Financier's jurisdiction.

12.    **Lack of Distribution Agreements**.  The parties hereby acknowledge that there is presently no agreement with any distributor to distribute the Picture. The success of the Picture will be dependent upon Night Comes Production's ability to complete the Picture, the attractiveness of the final product to a distributor and the distributor's willingness to commit substantial sums to promote the Picture successfully. Night Comes Productions will not have the financial capability to distribute the Picture itself. The gross revenue derived from the Picture is dependent, among other things, upon the interest of distributors and their ability to obtain suitable distribution via theatrical, television, home video and/or other media and in selecting proper release dates and appropriate advertising and promotion for the Picture. The negotiation of final distribution agreements, which frequently occurs (if at all) near the time of completion of motion pictures, will have a substantial impact upon the amount of receipts available to Company from the exploitation of the Picture. There is no assurance that such negotiations will result in revenues or profits to Company. Furthermore, there is no assurance that the Picture will be distributed or that such distribution will be profitable to Company. The fact that any distributor derives profits from its distribution of the Picture will not, in turn, assure that Company will also derive profits therefrom.

13.     **<u>No Assurance of Return of Financier Equity Investment or Profits</u>**.  Financier has no assurance of receiving a return of the Financier Equity Investment or any profit in excess thereof. Financier has been advised to seek independent legal counsel before making the Financier Equity Investment commitment and fully understands, and can withstand, that there is an extremely high risk of loss associated with making the investment. Financier acknowledges that no assurances, guaranties, representations or warranties have been given that by entering into this Agreement that any recoupment and/or profits will be realized, and Financier is not relying and has not relied on any statements, representations or warranties of any person or entity in making the decision to provide the Financier Equity Investment or to enter into this Agreement. Financier is sophisticated in investment and business matters and is knowingly, voluntarily and intelligently entering into this Agreement.  A more comprehensive list of risk factors is attached hereto as <u>Exhibit A</u>.

14.     **<u>Indemnification</u>**.

(a)     Company shall indemnify, defend, and hold Financier and its successors, assigns, affiliates, agents, officers, directors, employees, members, managers, partners and shareholders harmless, against any third party liability, claim, cause of action, damage or expense (including, without limitation, reasonable outside attorneys fees, expert witness fees, disbursements and court costs regardless of whether litigation is commenced) ("**Claims**") arising from a breach of Company's representations and warranties and covenants hereunder, except to the extent such Claims are based on facts or circumstances for which Financier is required to provide indemnity pursuant to clause (b) below.

(b)     Financier shall indemnify, defend and hold Company and its affiliates, and their respective successors, assigns, agents, officers, directors, employees, members, managers, partners and shareholders harmless, against any Claims arising from a breach by Financier of its representations and warranties and covenants hereunder.

15.     **<u>Assignment</u>**.  Neither party shall have the right to assign this Agreement or delegate its duties under this Agreement, without the prior written consent of the other party, and any attempted assignment without such consent shall be null and void *ab initio*. Notwithstanding the foregoing, except with respect to Financier's approval rights (if any) to be exercised hereunder, each party shall be free to assign this Agreement, or any part hereof, at any time, to any person or entity, and upon such assignment, the assigning party, as applicable, shall be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (a) a person or entity into which the assigning party, as applicable, merges or is consolidated or (b) a person or entity which acquires all or substantially all of the assigning party's business and assets or (c) a person or entity which is controlled by, under common control with, or controls the assigning party, as applicable.

16. **Further Documents**. Each party shall, at the request of the other party, execute and deliver any additional agreements, documents and instruments reasonably necessary to give effect to the terms of this Agreement.

17. **Arbitration**. Any controversy, claim, or dispute arising out of or related to this Agreement or the interpretation, performance, or breach hereof shall be submitted for binding and final resolution to the Los Angeles office of JAMS, or its successor ("**JAMS**"), shall be heard before a single neutral arbitrator, and shall be initiated and conducted according to the then-current JAMS Arbitration Rules and Procedures, in effect as of the date hereof. The parties will be entitled to discovery on the same basis as in a court proceeding. The arbitrator shall apply Delaware law. Unless otherwise agreed by the parties at the time of any arbitration, the arbitration hearing/proceedings on the merits shall: (1) occur within six (6) months after the initial demand for arbitration is submitted; and (2) last no longer than five (5) hearing days. The prevailing party in the arbitration shall be entitled to its reasonable attorney's fees and its costs. The arbitrator's decision shall be in writing, and shall be final, binding, and shall be enforceable by any court having or acquiring jurisdiction.

18. **Remedies**. In the event of a failure or omission by Company constituting a breach of its obligations hereunder, the damage, if any, caused Financier by such breach is not irreparable or sufficient to entitle Financier to injunctive or other equitable relief. Consequently, Financier's sole rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law and Financier shall not have the right in such event to enjoin or restrain the distribution or exhibition of the Picture, nor to rescind this Agreement, in whole or in part.

19. **Notices**. All notices and/or approvals required or permitted to be given pursuant to this Agreement shall be in writing, and shall be delivered either personally, by overnight delivery service, or by US certified or registered mail, postage prepaid, return-receipt requested and addressed to the parties at their respective addresses as they appear below. Notices and/or approvals may also be given by email to the email addresses which appear in the signature blocks below, provided that either (i) receipt of the email transmission is acknowledged in writing by the receiving party, which may also be by email transmission, or (ii) the transmitting party obtains a written confirmation from its own email transmission, as applicable, showing that the entire transmission was transmitted to the receiving party, without interruption, and a copy of the notice is also sent by one of the other above-described methods of service. The parties may change their addresses or email addresses for notice and/or approval by giving notice of such change in accordance with this section, but neither party shall be entitled to require that the notices be given to it at more than two addresses. Notices and/or approval sent by overnight delivery services shall be deemed received on the business day following the date of deposit with the delivery service. Mailed notices and/or approvals shall be deemed received upon the earlier

of the date of delivery shown on the return receipt, or the fifth business day after the date of mailing. Notices and/or approvals sent by email shall be deemed served on the date of transmission, provided that such notices are sent prior to 5:00pm in the time zone of the recipient, otherwise on the next business day. Notwithstanding the foregoing, actual receipt of notice by a party shall constitute notice given in accordance with this Agreement on the date received, unless deemed earlier received pursuant to this section.

20.    **No Partnership**.  This Agreement does not establish a relationship of partners or joint venture between Company and Financier; and neither party shall hold itself out as agent or authorized representative of the other, nor shall there be any fiduciary or other legal relationship of trust established between Company and Financier hereunder.

21.    **Miscellaneous**.  The validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Delaware applicable to contracts entered into and wholly performed entirely therein. No amendment or modification hereof shall be valid unless contained in a writing signed by both parties. This Agreement is the entire agreement between the parties, and replaces any prior agreements, understandings, representations or warranties, verbal or written, as to the subject matter hereof. This Agreement shall bind and inure to the benefit of the parties and their respective permitted assigns, licensees, successors, heirs and representatives. Each party hereto generally consents to service of process by registered mail, return receipt requested, at the addresses set forth below to receive service of process in any action, suit or proceeding with respect to any matter as to which it has submitted to jurisdiction as set forth above. The headings of the paragraphs hereof are for convenience only and shall not be deemed to limit or in any way affect the scope, meaning or intent of this Agreement or any portion hereof. Should any paragraph or provision of this Agreement be held to be void, invalid or inoperative as a result of any judicial or administrative proceeding or decree, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein. *[Signature page follows]*

**131 PICTURES, LLC**

"Company"

By: _____
Title: CEO and President

Address for Notices:
3903 Hawthorne Avenue, Unit 101
Dallas, TX 75219
Email: suraj@the131group.com

"Financier"

Name: Adam J Reback

Signature: _____

Financier Equity Commitment: $125,000

Address for Notices:

1879 Montauk Highway
Amagansett, NY 10023

This Agreement may be executed in one or more counterparts (including via facsimile or electronic transmission), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

## <u>SCHEDULE 1: DEFINITIONS</u>

Any capitalized terms not defined in this Schedule 1 shall have the same meanings ascribed to them in this Agreement.

"**Collected Gross Receipts**" means all Gross Receipts actually received into the Collection Account.

"**Gross Receipts**" means all amounts from all sources worldwide derived from the distribution and exploitation of the Picture, including all allied, ancillary, derivative (solely with respect to derivative rights payments), and subsidiary revenues from any and all rights, formats and media presently known or hereafter devised and actually received by or credited to Company.

# EXHIBIT A:  RISK FACTORS

The business of Company will be to provide financing for the Picture. In such ventures the risk of loss is high in comparison with the prospects for any profit and that therefore any investment in Company is suitable only for those investors who do not require liquidity in their investment. The production of the Picture by Night Comes Productions is an entirely new and speculative venture, and it is impossible to project or predict whether the Financier Equity Investment will result in a gain or loss to the investors and therefore **ANY POTENTIAL INVESTOR PARTY TO THIS AGREEMENT SHOULD NOT INVEST IN THE PICTURE UNLESS SUCH PARTY IS PREPARED FOR THE POSSIBILITY OF TOTAL LOSS OF THE INVESTMENT.** The success of a film in theatrical distribution, television, home video and other ancillary markets is dependent upon public taste which is unpredictable and susceptible to change. The success of a film may also be significantly affected by the number and popularity of other films being distributed, therefore, the success of a motion picture is impossible to predict and absolutely no assumptions should be made respecting the ultimate economic results which may be realized by the Picture. In addition to the foregoing, the risks of an investment in Company include, without limitation, the following:

(a)    <u>Lack of Control over Production and Exploitation of the Picture</u>. Other than limited approval rights in favor of Company, the production and exploitation of the Picture is controlled by Night Comes Productions. Night Comes Productions is not an affiliate of Company, and Company therefore has no direct or indirect ability to control the actions and decisions of Night Comes Productions. Accordingly, Company's role with respect to the Picture is primarily that of a passive investor.

(b)    <u>Speculative Nature of the Business</u>. The business of the production and exploitation of motion pictures is highly speculative and has historically involved substantial risks. The costs to produce a motion picture are often miscalculated and may be increased by factors beyond the control of its producer, resulting in inability to complete production which would result in abandonment of the project and a total loss of all funds provided therefore. The ultimate profitability of any motion picture depends upon its audience appeal in relation to its cost of production and distribution. Audience appeal, in turn, depends upon unpredictable critical reviews and changeable public taste, among other things, which cannot be readily ascertained in advance. Based upon available information, a majority of completed motion pictures fail to generate sufficient revenues to recover their cost of production and distribution. Accordingly, there can be no assurance that Night Comes Productions will exploit the Picture so as to enable Company to recoup all or any portion of its Financier Equity Investment or to yield a profit on its Financier Equity Investment. Furthermore, until the completion of post-production and the sale of the Picture to a distributor, it is unlikely that Company will derive any revenues from the Picture. In addition, Company cannot predict the timing or amount of revenues, if any, it may derive from the exploitation of the Picture.

(c)    <u>Risks of Motion Picture Production</u>. There are significant risks involved in the production of any motion picture, many of which may materially delay completion of the Picture or make completion impossible. If the Picture is not completed, no revenues

will be derived from the Picture. Such risks include, but are not limited to, production costs exceeding available funds, labor disputes, death or disability of key talent or other key personnel, equipment difficulties, destruction of completed film negatives or unanticipated adverse weather conditions. The occurrence of any such event may cause delays and increase production costs and may have a material adverse effect upon the Financier Equity Investment. These or similar events are beyond the control of Financier, the Other Financiers and/or Company. To the extent that funding sources available to Night Comes Productions are insufficient to cover all production costs of the Picture, all such contributions may be lost.

(d)    <u>Competition</u>. Company intends to engage in a highly competitive business and therefore the Financier Equity Investment contains a high degree of risk. Competition is encountered in different phases of the production and exploitation of a motion picture. In the production phase of the Picture, competition may have a material effect on the employment and cost of personnel. After the completion of its production, the Picture will, upon its distribution, be competing with other motion pictures and, indirectly, with other forms of public entertainment. Such competition in the phases of the production and exploitation of the Picture may have a material adverse impact on Financier's Equity Investment. Many companies involved in the production and exploitation of motion pictures have, from time to time, encountered financial difficulties, which reflect the highly competitive character of, and adverse development in, the motion picture industry as well as the unpredictability of public reaction to motion pictures.

(e)    <u>Single Project Investment</u>. The financial performance of Financier's investment is solely dependent upon the success of the Picture. In addition, the financial performance of the investment in the Picture is dependent upon the ability Night Comes Productions to complete the Picture in a timely and cost-effective manner, the ability of Night Comes Productions to obtain successful theatrical distribution of the Picture and the ultimate audience appeal of the Picture if and when completed.

(f)    <u>Risk of Motion Picture Distribution</u>. Distribution of films requires specialized marketing expertise and considerable financial resources. Company and Night Comes Productions will be dependent on a distributor for this marketing expertise and for providing funds for prints and advertising. Without the participation of a distributor, there is little likelihood that significant revenues from any source will be realized. The participation of a distributor does not, however, guarantee that the distribution will be successful or that substantial revenues will be realized therefrom.

(g)    <u>Changes in the Film Industry</u>. Technological developments have resulted in the availability of alternative distribution mediums for film entertainment, including expanded pay and cable television and videocassettes, DVDs and digital technologies. These alternative distribution mediums typically have different revenue allocation arrangements from one another and such allocation arrangements often vary over time. In recent years, revenues from licensing of films to network television have decreased, revenues from pay television initially increased substantially, then leveled and have

recently begun to fall, and revenues from videocassettes and DVDs and digital platforms have increased significantly while being generated by a smaller group of major titles.

Generally, however, the level of theatrical success remains a critical factor in generating revenues in these ancillary markets.

(h)    <u>Management</u>. Other than as set forth in this Agreement, the investors will not have a right to participate in the management of the business of Company. Accordingly, no prospective investor should invest unless he, she or it is willing to entrust all aspects of management to Company. Further, as described above, Company has a limited ability to control the production and exploitation of the Picture.

(i)    <u>Federal Income Tax Consequences</u>. Company has not been structured to provide tax benefits to investors, and an investment made pursuant to this Agreement should not be based on the expectation that tax benefits will accrue therefrom.